*140 OPINION OF THE COURT
Peter G. Dounias, J.
Defendant Mary Quinn stands charged with operating a motor vehicle while under the influence of a drug, to wit, cocaine, in violation of Vehicle and Traffic Law § 1192 (4). At issue before the court is whether certain evidence sought to be introduced at trial by the People meets the standards of admissibility set forth in Frye v United States (293 F 1013 [DC Cir 1923]) and People v Middleton (54 NY2d 42 [1981]). The pertinent facts are as follows:
Defendant was arrested in the early morning hours of August 1, 1988 by Troopers Brian M. Kennedy and E. S. Mlodynia of the New York State Police. After transport to a facility in East Islip, defendant submitted to a 12-step "Drug Influence Evaluation” administered by Trooper Kennedy. Trooper Kennedy was and is a "Drug Recognition Expert” (DRE), trained under the auspices of the International Association of Chiefs of Police and the DRE Coordinators of the State of New York.
The first segment of the evaluation or "protocol”, as it is called, required a measurement of defendant’s blood alcohol concentration. Defendant’s BAG was .00. The second segment called for an interview of the arresting officer. As the arresting officer, Trooper Kennedy accordingly outlined the details leading up to and immediately following defendant’s arrest. He also noted defendant’s wide-eyed, anxious appearance immediately after arrest and an abnormal dilation of her pupils in low light. The third component of the protocol consisted of a "cursory” evaluation of the subject including a notation of her appearance, an initial taking of her pulse and a series of questions. Defendant was asked "What have you eaten and when?” to which she replied "Pizza at 12 p.m.” She was asked "Have you been drinking and how much?” to which she replied that she had not been drinking. When asked what time she thought it was without looking at her watch, she estimated 1:30 a.m. (It was approximately 1:30.) She further told Trooper Kennedy that she had last slept the day before for eight hours, that she was neither sick nor injured, nor epileptic or diabetic; that she did not take insulin; that she had no physical defects and was not currently under the care of a doctor or dentist. To the question, "Are you taking any medication or drugs?” defendant answered, "Just coke.” At this stage of the evaluation, defendant’s pulse was 110 beats *141 per minute. Her pupils were equal in size and measured eight millimeters in room light. Trooper Kennedy also observed that defendant’s speech was rapid, that her breath was stale, that her face was flushed and that she had a wide-eyed appearance.
The fourth component of the evaluation was a check of defendant’s eyes for horizontal and vertical gaze nystagmus. Nystagmus is an involuntary jerking of the eyeball. The test for horizontal gaze nystagmus is performed by requiring the subject to focus on a stimulus, here a pen, which is passed horizontally back and forth across the subject’s field of vision. As the subject’s eyes focus upon the moving stimulus, a notation is made as to whether or not they smoothly pursue it. Then the stimulus forces the eyes to the limit of their range, called the maximum angle of deviation, both right and left. A notation is made as to whether nystagmus is present at the maximum angle and a further notation is made if nystagmus appears at an angle less than maximum. The test for vertical nystagmus is similar, differing only in that the stimulus is moved vertically and measures nystagmus appearing at vertical rather than horizontal angles. Finally, the stimulus is moved inward toward the bridge of the subject’s nose to test the eyes’ ability to converge.
Trooper Kennedy, noting that defendant was unable to focus her attention on the stimulus, reported that no nystagmus of any sort was observable. He also noted that her eyes converged properly.
The next portion of the drug influence evaluation was devoted to four so-called psychophysical or "divided attention” tests. In the first of these, the Rhomberg test, defendant was instructed to stand with her hands at her sides and feet together, to tilt her head back, close her eyes and estimate, without counting out loud, the passing of 30 seconds. When asked, defendant said she understood these directions but estimated that 30 seconds had passed after only five seconds. Defendant had failed her first test.
The next test performed was the "walk and turn”. Defendant was instructed to place her left foot in front of her right, heel touching toe, hands at her sides, and watch Trooper Kennedy demonstrate the procedure. Then, defendant performed the test herself, taking nine steps forward, again heel to toe with her arms at her sides, turning, then taking nine steps back. During both the instructional phase and the actual test itself, defendant could not keep her balance, stopping *142 frequently and stepping off the line. Trooper Kennedy concluded that she had failed this test as well.
Defendant also failed the "one leg stand”. This test required defendant to raise one foot six inches off the ground with her hands at her sides while counting to 30 in thousands, i.e., one-one thousand, two-one thousand, etc. Both left and right were tested. Defendant swayed and raised her arms to keep her balance. She also counted in ones instead of thousands as instructed.
The fourth divided attention test was the "finger to nose”. Defendant was instructed to extend her arms outward, palms up, to tilt her head and close her eyes, and to touch her nose with whatever finger Trooper Kennedy directed her to. This test, Kennedy reported, the defendant passed.
The next component of the protocol required a set of vital signs. Defendant’s pulse was 120 beats per minute. Her blood pressure registered 152 over 100, and her temperature was 99.9 degrees Fahrenheit.
Then defendant submitted to a "darkroom evaluation”. After 90 seconds in "near darkness”, Trooper Kennedy measured the size of her pupils using a tool called a pupilometer. They measured seven millimeters. Creating "indirect” lighting by shining a penlight across defendant’s nose, Trooper Kennedy took a second measurement of defendant’s pupils. In indirect light, they measured 6Y2 millimeters. In response to direct light, Trooper Kennedy reported that defendant’s pupils "pulsated” from 5 to 5 Yi millimeters, a phenomenon known as hippus. While in the darkroom Trooper Kennedy also looked for signs of oral and nasal drug ingestion and observed that defendant’s nose was "very irritated and runny”. A check of defendant’s arms was negative for "tracks” or needle marks. She exhibited muscular rigidity and tremors and had a very tense appearance. Defendant was asked again if she had used drugs and when. She replied, "Coke. Two eightballs”, and that she had used them at about 11:00 p.m. She was asked if she would submit to a blood test and ultimately did.
All data, observations and results gleaned from defendant’s examination were recorded on a preprinted form. Finally, Trooper Kennedy was ready to complete the last portion of the protocol, to render his opinion as to whether or not defendant was impaired and if so, by what classification of drug. With reference to a "drug classification chart”, Kennedy concluded that defendant was impaired by the use of cocaine. *143 Toxicological analysis of defendant’s blood confirmed his opinion, adding that she had used diazepam (Valium) as well.
In a prosecution for violation of Vehicle and Traffic Law § 1192 (4), it is of course the People’s burden to prove beyond a reasonable doubt that a defendant was driving while impaired by the use of a drug (see, People v Wiley, 59 Misc 2d 519). Accordingly, the People herein seek to offer the observations and measurements made by Trooper Kennedy during defendant’s drug influence evaluation and his opinion at defendant’s trial. After a lengthy hearing, the court has been requested to rule on three issues: the admissibility under Frye (supra) of the results of the drug influence protocol as a whole; the admissibility under Frye of the horizontal gaze nystagmus component by itself; and a ruling as to Trooper Kennedy’s qualification to accurately administer the evaluation and give his opinion at trial. It has been held that evidence of horizontal gaze nystagmus (HGN) sought to be introduced as indicia of intoxication is inadmissible without a showing that its underlying principles meet the Frye standard (see, People v Erickson, 156 AD2d 760 [3d Dept 1989]; People v Torrey, 144 AD2d 865 [3d Dept 1988]; People v Saputo, App Term, 9th & 10th Jud Dists, Apr. 14, 1988, No. 87-211), but no rulings have come to light. It appears further that the drug recognition protocol has not been addressed either. These are, then, all questions of apparent first impression in the State of New York.
Nine witnesses testified on behalf of the People. They are Richard Clark Studdard, formerly a sergeant with the City of Los Angeles Police Department and originator of the DRE program; Marcelline Burns, Ph.D., a research psychologist and director of the Southern California Research Institute; Sergeant Thomas Page of the City of Los Angeles Police Department, current Officer in Charge of the DRE Unit; Zenon Zuk, M.D.; David O. Peed, O.D.; Edward M. Briglia, Ph.D., Chief of the Toxicology Laboratory of the Medical Examiner for the County of Suffolk; Sergeant Michael Hayes of the Nassau County Police Department, Commanding Officer of the Central Testing Section; Technical Sergeant Douglas Paquette of the New York State Police Department and Coordinator of the New York State DRE program; and Trooper Brian M. Kennedy. The defense called no witnesses.
The Drug Recognition Expert program was conceived in the City of Los Angeles in the early 1970s. The court heard much testimony detailing the reasons behind the program’s develop *144 ment. Sergeant Richard Studdard, one of the DRE’s originators, testified that training for police officers in the area of recognizing drug-impaired individuals was at the time nonexistent. The effects of alcohol were well documented and recognized within the law enforcement community, but the vast number of commonly abused drugs and their varied effects upon human behavior and physiology had not as yet been dealt with in a concise manner. Further, it was the testimony of Dr. Briglia and others that impairment cannot necessarily be inferred from the presence of a drug in a person’s body fluids. Dr. Zuk explained in great detail that it is not possible to reliably extrapolate from a known quantity of a drug in a person’s blood stream to a correlative level of impairment as may be done with alcohol.[1] Accordingly, Sgt. Studdard set about to document and compile information on drug ingestion symptomatology, to develop and standardize procedures to detect drug symptoms, and to organize a program to train police officers in the use of these procedures. The DRE program and protocol are the result.
Dr. Zuk testified that psychoactive drugs (those at issue here) are those which act upon the central nervous system, and thus can affect anything and everything from a person’s coordination to his or her thought processes in a "limitless” number of ways. He, among others stated, however, that psychoactive drugs can be classified according to their most observable effects. The DRE drug classification charge purports to establish seven classifications each comprised of drugs which create the same or similar effects.
*145 It was Sgt. Page who testified in greatest detail as to these drug classifications.[2] He testified that the first category, central nervous system depressants, is comprised of six subcategories of drugs, namely, barbiturates, nonderivatives of barbituric acid that have effects similar to barbiturates, antianxiety drugs, antidepressants, antipsychotic tranquilizers, and so-called "combinations” of the above. The effects of central nervous system depressants generally mirror those of alcohol. They cause HGN, and in higher doses, vertical gaze nystagmus (VGN). They impair the eyes’ ability to converge. They depress the subject’s pulse and blood pressure below the normal range, impair time and depth perception, promote muscle flaccidity and cause "gait ataxia”, i.e., a fanning out of the limbs to maintain balance. The subject’s temperature would generally be normal as would pupil size at all light levels.[3]
The second category, inhalants, is a diverse group of substances which share, among other things, the route of administration suggested by their name. The group includes toluene (glue), paint thinners, benzene, certain aerosol sprays and synthetic gases such as nitrous oxide. Again, the effects are like those caused by alcohol, gait ataxia, slurred speech, and a withdrawn appearance. HGN will be present. Vital signs will vary according to substance used. Most, as they displace oxygen prompting the heart to speed the limited supply throughout the body, will cause the elevation of pulse and blood pressure. Some synthetic gases cause dilation of the coronary blood vessels and thus a lowering of blood pressure. Pupil size would generally be normal, temperature normal to elevated. Often, the substance used will leave behind a characteristic, telltale order.
The third category, phencyclidine, also known as PCP, was developed as a surgical anesthetic because of its ability to block pain without depressing vital signs. But its adverse *146 effects ultimately rendered it unsuitable for human use. One key "symptom” is the bizarre, unpredictable behavior exhibited by those who consume it. It can cause hallucinations. The extremely enhanced muscle rigidity produced by POP may give the subject a robotic, trance-like appearance. There is a cyclical effect in the way the drug is metabolized causing this trance-like state one moment and aggressive, hostile behavior the next. HGN is obvious without deviation of the eyes and VGN is almost always present as well. Pupil size is normal. Vital signs are elevated, often dangerously so, and the subject will be hot to the touch.
Cannabis or marihuana, the fourth category, causes altered time and depth perception, forgetfulness and a deterioration of attention span. The conjunctiva will be dilated (bloodshot eyes) but pupil size is generally normal. HGN will not be present. Marihuana dramatically increases the pulse rate, though temperature and blood pressure will be within normal ranges.
The fifth category, narcotic analgesics, is comprised of opiates and opioides, nonopiate drugs which have similar effects, some legal, some not. Their medical uses include pain relief and cough suppression. A user may appear sleepy and exhibit slow, deliberate body movements. There is no nystagmus and the eyes converge properly. But this category causes marked pupil constriction under three millimeters with no apparent response to light changes. One or both eyelids may droop, a phenomenon known as ptosis. Vital signs are significantly depressed. Narcotic analgesics are in most cases injected, usually into the inner arm, and therefore, abusers will have puncture wounds in various stages of healing.
Central nervous system stimulants, the sixth category, encompass many different substances, including cocaine in its various forms, amphetamines, and methamphetamines. The effects of these drugs are "sympathomimetic”, that is, they activate the sympathetic division of the autonomic nervous system which prepares the body to confront danger. As such, users display hypervigilance and hypersensitivity, rapid speech and often agitated, overreactive behavior. The drugs’ appetite-suppressive nature causes a deterioration in health in the long term. Nystagmus will not be present and the eyes will converge properly. Pupils, on the other hand, will dilate just as they do when the subject faces danger and hippus may occur when the pupils are stimulated by direct light. The sympathomimetic action of this category will also cause the *147 subject’s blood supply to be diverted to the vital organs leaving the extremities cold to the touch. Vital signs will be markedly increased.
The last category, hallucinogens, are named for the fact that they severely distort thought processes. Sgt. Page testified that hallucinations can be visual, auditory, tactile or gustatory, or even a "scrambling” of these, where users will report that they have "seen” sounds. The category includes peyote and other organic substances as well as synthetics such as LSD and mescaline. In addition to the agitated, often bizarre behavior this category causes, the effects are similar to those of stimulants. HGN is absent but pupils are dilated, and vital signs will be enhanced.
Sgt. Page further testified as to the special problems presented by "polydrug” use, that is, the ingestion of drugs from two or more categories at the same time, and the effects that can be expected. When two categories taken together cause the same symptom, their effects are said to be "reinforcing” or "additive”. As such, were a central nervous system stimulant combined with PCP, both of which increase the pulse rate, one would expect to observe an elevated pulse rate. Were cocaine, which elevates vital signs, ingested with a central nervous system depressant, which would depress vital signs, the effect with respect to vitals would be said to be "antagonistic”. As such, an observer could expect a range from high to normal to low depending upon when each drug was taken and how long afterward the subject is being evaluated. Again, combine cocaine, which does not cause HGN, with a barbiturate, which does, and the effect is said to "overlap”. In such cases, an observer would expect to see the overlapping effect, i.e., HGN will be present. Where neither category causes a particular symptom, the symptom will not be observable. This is called a "null” effect.
Given these "rules”, Sgt. Page stated that the effects of "just about any” drug combination can be predicted. Further, using the DRE protocol, the trained technician will be able to detect the polydrug as well as the single drug user.
The protocol, then, is a systematic procedure by which the drug symptoms Sgt. Page outlined are detected and documented. Dr. Zuk, a physician who has taken the DRE course, likened the protocol to a clinical examination. A clinical exam, Dr. Zuk explained, is comprised of two essential components, the taking of a history and a sequence of "maneuvers” *148 designed to examine the body of the patient. With the information obtained from the history and his findings from the physical examination, the physician forms a "diagnosis” or explanation for the patient’s complaint. The drug recognition protocol includes a series of questions which parallel the taking of a history, most of which, Dr. Zuk stated, are perfectly relevant in the ordinary clinical setting. The physical "maneuvers” are clinically relevant as well. Nothing in the protocol was invented for the occasion. Dr. Zuk stressed that each item is "absolutely relevant” to drug detection and permits an accurate assessment of both impairment and the drug category causing the impairment. He stated further that the protocol is so comprehensive, that rarely would more information be necessary in order for the tester to form a valid opinion.
Dr. Zuk testified that the divided attention tests have been borrowed from the medical profession as well. Their clinical application is to detect coordination problems referable to a disturbance in the cerebellum, a primary component of the central nervous system. As psychoactive drugs affect coordination, their applicability is obvious.
In addition, the psychophysical tests were the subject of the scrutiny of Dr. Burns, a researcher in the area of the effects of drugs on human behavior. Under contract with the National Highway and Traffic Safety Administration (NHTSA), Dr. Burns, director of the Southern California Research Institute, sought to determine the three "best” sobriety tests performable by police officers at roadside. In doing so, Dr. Burns testified that she reviewed the "relevant literature” and observed the use of various tests in the field. A "large, in-house laboratory controlled experiment” with drugged subjects and police officer examiners was conducted with six candidate tests. The three which survived after this experiment were tested in an additional controlled laboratory study and then in the field. One criterion was, of course, that the chosen three must be reliable indicators of intoxication. Dr. Burns reported to NHTSA that the data obtained from her work indicated the three "best” to be the horizontal gaze nystagmus test, the one leg stand and the walk and turn. With additional NHTSA funding, the winners were refined and standardized to their present form.
Testimony concerning nystagmus was also received from Dr. Peed, an optometrist licensed by the State of Georgia. First, Dr. Peed reviewed the functions of the basic eye structures, *149 including the cornea, iris, cystaline lens, retina and extraocular muscles. Of particular importance with respect to HGN is a structure called the fovea. The fovea, an area comprising 1% of the retina, is that portion responsible for sharp focus, i.e., it is the only portion of the retina capable of 20/20 refraction.
Dr. Peed further explained the functions of the various brain and neurological structures involved in the visual sensory process. He testified in great detail about five separate but integrated eye movement systems, two of which are important in producing nystagmus. "Saccadic” movements are very quick eye movements governed by the saccadic system, and can be either voluntary or involuntary. Such saccadic movements are initiated by some retinal stimulus, in particular an image which does not fall directly upon the fovea. The appearance of a nonfoveal image induces an involuntary saccadic movement to bring the fovea into position to receive the image.
The "smooth pursuit” eye movement system, as its name implies, permits the eyes to follow a smoothly moving stimulus, that is, to keep the fovea centered on it. It is, in fact, a breakdown in the ability of the smooth pursuit system to maintain the fovea on the object of regard that is responsible for nystagmus. When the smooth pursuit system is no longer able to fix the fovea on the object, the saccadic system, stimulated by the nonfoveal image, produces a quick, overriding eye movement to return it to the object. Nystagmus, then, is the presence of involuntary, saccadic eye movements following a breakdown of the smooth pursuit system.
Dr. Peed gave many examples of what could cause a failure of the smooth pursuit system. Pathological causes could include brain lesions, aneurysms and cerebral vascular accidents, even infections of the central nervous system. Physiological types include rotational and postrotational nystagmus. Postrotational nystagmus was the subject of an in-court demonstration by the People wherein Sgt. Page was spun around by Sgt. Studdard. When the spinning was finished, the court was able to observe a horizontal oscillation of Sgt. Page’s eyes which Sgt. Studdard testified was postrotational HGN. Both Sgt. Studdard and Dr. Peed stressed that postrotational nystagmus is a fleeting phenomenon and not associated with the ingestion of drugs. In fact, after two or three minutes, the court could no longer detect movement in Sgt. Page’s eyes.
*150 Another type of physiological nystagmus more related to the issues at hand is "gaze invoked” nystagmus. "End point” nystagmus, a type of gaze invoked nystagmus, occurs when the eyes are extended to the maximum angle left or right. No matter how induced, Dr. Peed testified, gaze invoked nystagmus is caused by a disruption in the integration of the eye movement systems, particularly the smooth pursuit system. Disrupt the system with the right substance and HGN is enhanced significantly. End point nystagmus, seen in the normal individual in "minutes” after the eyes are extended, will appear in a greatly reduced interval. The angle of onset as well will be measurably shortened.
Both Dr. Peed and Dr. Burns testified that they discovered HGN and its relation to drug impairment in "scientific literature” published on the topic. Sgt. Studdard states that HGN, also known as "barb bounce”, was a tool used by Los Angeles police officers to recognize glue-intoxicated individuals as early as 1960. All agreed that the test is reliable.
The protocol as a whole was the subject of a further study designed and conducted by Dr. Burns pursuant to NHTSA funding. Called the Los Angeles Field Validation Study of the Drug Recognition program (hereinafter LA Study), the experiment involved the evaluation by DRE police officers of 173 actual arrestees, most of whom had taken two or more substances. In 94% of all cases in which the DRE opined that an individual was impaired by a drug, a drug was in fact found by analysis of a fluid sample obtained from that individual. Further, DREs accurately identified at least one drug classification in 135 cases. In 23 cases, the DRE was entirely incorrect as to what substance was causing the intoxication.
Sgt. Paquette testified that in 1990, toxicology corroborated the opinions of DREs assigned to him 97% of the time. Sgt. Hayes’ 1990 statistics indicated an 81% corroboration rate.
The DRE program is now one of national significance and is administered and regulated by NHTSA and the International Association of Chiefs of Police (IACP). Sgt. Paquette stated that programs exist in some 19 States. In order to become a DRE certified by NHTSA (only police officers are eligible for certification), Trooper Kennedy, and candidates in general, was required to successfully complete a 16-hour "preschool” in which field sobriety testing is reviewed and the candidate is introduced to DRE materials. Those who pass the written examination following preschool progress to the next phase, a *151 56-hour segment of in-depth classroom and hands-on training. Again, passing an academic examination entitles the candidate to advance to the third or "certification phase” of DRE training. During this phase, a sort of internship, DRE candidates evaluate actual arrestees under the supervision of certified DRE instructors. In order to earn certification, NHTSA requires the candidate to have conducted 12 evaluations involving at least 3 drug categories. NHTSA further requires that the candidate receive the recommendation of one instructor who has observed him or her conduct the evaluations. New York’s DRE guidelines for certification, which are more stringent, require that the candidate conduct 15 evaluations involving 4 drug categories and that he receive the recommendation of two instructors.
The ultimate standard for the admission of scientific evidence in the State of New York is enunciated in Frye v United States (293 F 1013 [1923], supra). In that case, the Court of Appeals of the District of Columbia stated "[j]ust when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.” (293 F, supra, at 1014.) The Court of Appeals of the State of New York refined this standard in People v Middleton (54 NY2d 42, 49 [1981], supra), stating "the test is not whether a particular procedure is unanimously indorsed by the scientific community, but whether it is generally acceptable as reliable”.
The court holds that the People have successfully established that both the HGN test and the DRE protocol meet the standards enunciated by Frye (supra) and Middleton (supra). In coming to this conclusion, the court has considered the credible and unrefuted testimony of nine witnesses each of whom stated that both HGN and the protocol permit the DRE to reliably and accurately determine whether an individual is impaired, and if so, by what classification of drug. Further, the court found the People’s evidence to be persuasive. The protocol is relatively simple. Jurors should have no trouble understanding the testimony of the DRE witness. This is not a case of a procedure so complicated and so technical that a "lay *152 jury [might] rely to an even greater degree on the expert witness * * * [whose] testimony may be accepted and credited without being properly evaluated” (People v Seda, 139 Misc 2d 834, 836 [Sup Ct, NY County 1988]; see, People v Shi Fu Huang, 145 Misc 2d 513). Cross-examination would seem an effective antidote to possible over-reliance.
Further, nothing contained in the protocol is a new invention. It is rather a compilation of tried and true procedures utilized by medical science and the law enforcement community in similar contexts for many years. In fact, several components of the protocol are already admissible on the issue of alcohol intoxication. The outcome of psychophysical testing (see, People v Jacquin, 71 NY2d 825; People v Nosek, 160 AD2d 898), witness observations of a subject’s gait (see, People v Babala, 154 AD2d 727), his speech and odor (see, People v Ritgers, 158 AD2d 628), the appearance of his eyes (see, People v Fiacco, 146 Misc 2d 330; see also, People v Shapiro, 141 AD2d 577), and his answers to questions, within constitutional parameters, are all admissible. What makes them so is that they are universally accepted as reliable indicators of alcohol intoxication. No expert is necessary to validate them. A layperson may even give his opinion that a person was intoxicated (see, Richardson, Evidence § 366 [Prince 10th ed]). That symptoms of drug intoxication are not well-known in most lay circles should not preclude the testimony of one who is educated and experienced in the field. Rather, this general ignorance creates the very necessity for the expert testimony sought to be introduced (see, Selkowitz v County of Nassau, 45 NY2d 97).
Finally, the court is persuaded by the level of accuracy achieved by the DREs who participated in the Los Angeles Study. This factor was also considered by the court in State v Johnson (Tucson City Ct, Ariz, Nov. 2, 1990, slip opn, at 8, Nos. 90056865, 90035833), the only decision concerning the drug recognition program to come to light. Stating that the "reliability and veracity of the conclusions reached by properly trained DRE officers [was] amply supported by the results of the Los Angeles Study and [another study]” (State v Johnson, supra, at 8), the court held that the Frye standard had been met.
HGN, the most "foreign” portion of the protocol, has been demonstrated to be generally regarded as reliable as well. Its use as an aid to law enforcement personnel during the last 30 years was documented by Sgt. Studdard. Its clinical recogni *153 tian, application and reliability were verified by Drs. Peed and Zuk. The test has been the subject of judicial scrutiny outside this jurisdiction where several States have determined it to be reliable in detecting alcohol intoxication. Of these, most do not even consider the HGN test to be a "scientific” one necessitating Frye analysis (see, e.g., State v Bresson, 51 Ohio St 3d 123, 554 NE2d 1330 [1990]; State v Murphy, 451 NW2d 154 [Iowa 1990]; State v Clark, 234 Mont 222, 762 P2d 853 [1988]; see also, State v Grier, 791 P2d 627 [Alaska App 1990]). The Supreme Court of Ohio, for instance, stated "[t]he HGN test cannot be compared to other scientific tests, such as a polygraph examination, since no special equipment is required in its administration. Thus the only requirement prior to admission is the officer’s knowledge of the test, his training, and his ability to interpret his observations. The admission of the results of the HGN test is no different from any other field sobriety test, such as finger-to-nose, walk-and-turn or one-leg-stand.” (State v Bresson, 51 Ohio St 3d 123, 129, 554 NE2d 1330, 1336, supra.) The Supreme Court of Iowa agreed with this approach, stating "[t]he ease with which the test may be administered and evaluated obviates the need for a more scientific interpretation” (State v Murphy, 151 NW2d 154, 158, supra). Where, however, it was determined that the HGN test was a "new technique based on scientific principles” requiring Frye approval it has been held that HGN is generally accepted as reliable by the scientific community (see, State v Superior Ct., 149 Ariz 269, 718 P2d 171 [1986]; State v Armstrong, 561 So 2d 883 [La App, 2d Cir 1990]; Malone v City of Silverhill, 575 So 2d 101 [Ala Crim App 1989], revd on other grounds 575 So 2d 106 [Ala 1990]).
Defendant has stressed that Trooper Kennedy "missed” the diazepam uncovered by chemical analysis of her blood and argues that this demonstrates that the protocol is inherently unreliable. The court does not agree. Trooper Kennedy explained this "failure”. As defendant was unable to keep her attention upon the moving stimulus, Kennedy could not determine whether HGN was present, as it should have been in the presence of a central nervous system depressant. Sgt. Page testified that where, as here, a particular "reading” cannot be obtained, a negative finding will be reported and the item will not be considered when the DRE forms his opinion. Subjects are, in effect, given the benefit of the doubt. Because of this, more "false negatives” or exculpatory errors occur than inculpatory ones. Furthermore, Frye (supra) does not require that *154 the People demonstrate that a technique is infallible (see, People v Leone, 25 NY2d 511, 517; see also, People v Tilley, 120 Misc 2d 1040; State v Superior Ct., supra). Defendant’s argument is therefore better addressed to weight than to admissibility.
Defendant contends further that the People’s evidence comes from witnesses with a personal stake in seeing the DRE program validated by the courts. In the absence of a broader spectrum of experts lending independent legitimacy to the program, defendant argues, the People have not met their burden.
It has been observed that
"[problems with the Frye standard * * * arise when the specialized community which may appropriately be called upon to judge whether a procedure has gained general acceptance is too narrow. In that scenario 'the consensus judgment mandated by Frye becomes illusory; the judgment of the scientific community becomes, in reality, the opinion of a few experts’ * * *
" 'The scientific tradition expects independent verification of new procedures. When other scientists analyze and repeat the tests, they counteract the dangers of biased reporting. It is scientists not responsible for the original research that confirm its validity.’ ” (People v Seda, 139 Misc 2d 834, 837, 846, supra.)
But in considering defendant’s argument, the court is left to ponder just who, other than the People’s witnesses, might be capable of giving relevant testimony on the development and administration of the program. Ultimately, the argument cannot be dispositive as "the relevant scientific community that must be shown to have accepted a new scientific principle is often self-selecting. Scientists who have no interest in a new scientific principle are unlikely to evaluate it” (State v Superior Ct., 149 Ariz 269, 277, 718 P2d 171, 179, supra; State v Johnson, supra).
In addition, the court does not agree that every witness had an interest in the outcome. Dr. Briglia, for instance, who confirmed that the DRE drug symptom chart accurately reflects the effects of each drug classification, stated he had no connection with the program whatsoever. Dr. Peed’s "connection” appeared to be nothing other than professional interest in the topic. Furthermore, the court cannot imagine what a person of Dr. Burns’ position and reputation would have to *155 gain by foisting unreliable sobriety tests based on faulty data or analysis upon the national highway safety scene.
Finally, the court holds that Trooper Kennedy, the recipient of in excess of 72 hours of training, may testify as to the observations he made while testing defendant and give his opinion that she was impaired by cocaine at her trial on the within charge. Though defendant has strenuously voiced a preference toward hearing "medical” testimony solely from licensed physicians and "toxicological” testimony from licensed toxicologists only, such rigid lines are not supported by law (see generally, Richardson, Evidence § 368 [Prince 10th ed]). The court believes that the protocol’s underlying principles are not so hypertechnical nor the skills required so specialized as to require professional medical training.

. Dr. Zuk stated that there are many reasons for this phenomenon and outlined several for the court. Alcohol (ethanol) is an extremely simple molecule which the human body metabolizes according to "zero order kinetics”. This means that the body cannot metabolize more per hour than 10 milliliters of alcohol regardless of the concentration in the body. Thus, even though the concentration of alcohol may increase, the body’s ability to break it down into nonactive components does not. Impairment will therefore increase with the concentration of alcohol in the bloodstream. Many other drugs, however, are metabolized according to "first order kinetics” meaning that the amount metabolized varies according to the quantity present in the body. Dr. Zuk also testified that while alcohol has no active metabolites, i.e., the components into which the body breaks alcohol down are not capable of producing impairment, many other drugs do. These psychoactive metabolites must then be metabolized in turn. Further, alcohol, generally ingested orally, is greatly diluted by organs of the digestive tract and cannot generate the so-called "rush” effect. Drugs with other routes of administration, particularly those that are injected, produce a more concentrated "high” soon after being taken than does alcohol.

. Sgt. Page earned a Bachelor of Arts degree in Industrial Psychology and a Master’s degree in Urban Affairs from the University of Detroit. His work in the public health field as well as his extensive training and experience in the areas of substance abuse and drug use symptomatology prompted this court to admit his testimony on drug effects. It is to be noted further that Dr. Briglia, a toxicologist, corroborated Sgt. Page’s testimony.

. The "normal” range for pulse was stated as 60 to 90 beats per minute, and for blood pressure, 120 to 140 systolic pressure over 70 to 90 diastolic pressure. Normal temperature was stated as 98.6 degrees Fahrenheit plus or minus 1 degree. Pupil size was stated as normally between 3 and 6 millimeters.