**Steve BURTON, Appellant,**

v.

**COMMONWEALTH of Kentucky,
Appellee.**

**No. 2006–SC–000784–MR.**

Supreme Court of Kentucky.

Oct. 29, 2009.

As Modified Nov. 2, 2009.

As Modified Dec. 8, 2009.

Rehearing Denied Jan. 21, 2010.

Shannon Renee Dupree, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, Bryan Darwin Morrow, Office of the Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice SCOTT.

A Circuit Court jury convicted Steve Burton of second-degree manslaughter, second-degree assault, and operating a motor vehicle with a suspended license, for which the trial court sentenced him to a total of twenty (20) years imprisonment. He appealed the Circuit Court judgment to this Court as a matter of right. Ky. Const. 110(2)(b). For reasons that the undue prejudice arising from the introduction of the urinalysis results, when viewed within the context of the other evidence, substantially outweighed its probative value under KRE 403, and thus were improperly admitted, we reverse Burton's second-degree manslaughter and second-degree assault convictions. We affirm his conviction for operating a motor vehicle with a suspended license.

## I. *FACTS.*

Burton's convictions stem from an automobile collision that occurred on a rural two-lane road. Burton's automobile collided head-on with an automobile approaching from the opposite direction driven by Jeffrey Bartolo. James Boyd was a passenger in Bartolo's automobile. Other than the occupants of the two vehicles, there were no eyewitnesses to the crash.

Shannon Sayre and Nick Parnell who lived nearby, arrived moments later and both testified at trial of their observations. Sayre heard a loud boom and saw there had been a wreck. She told Parnell, who called 911 and went to the scene of the accident.

Following the collision, Burton's automobile came to rest against a tree. Burton was trapped in his car with a broken arm, but conscious and trying to extricate himself. Burton knew Parnell, and asked him to help get him out. Parnell told him to remain in the car until the ambulance arrived because he might be hurt. Burton, however, asked Parnell not to call the police or the ambulance, asserting he was not hurt. Police and paramedics arrived shortly thereafter.

Buffy Kyle and Mark Travis were the first paramedics to arrive. They found Burton trapped in his car and concluded that he did not appear to have any life-threatening injuries. Kyle went to the other car, while Travis remained with Burton. Travis instructed Burton to remain calm and not to move because movement could make his injuries worse. Burton, however, continued to struggle.

When Burton finally extricated himself, his fractured arm flopped unnaturally "from side to side." He continued, however, to insist that he was not injured. Travis then tried to walk Burton across the road to the ambulance, but Burton returned to his car. He continued to wander "back and forth" from the car to the ambulance. At one point, Travis had to pull Burton from the path of an oncoming ambulance. Eventually, Travis succeeded in getting him into the ambulance.

Burton first told Travis that he hit a tree but later told him that someone else had been driving the automobile, and that he did not know what happened. At times, Burton appeared aware and oriented, but at other times, he just kept asking about the other car. Kentucky State Trooper John Sims (Officer Sims) thought perhaps Burton had a head injury or some type of amnesia. Burton, however, knew his name and his date of birth.

When Officer Sims spoke to Burton in the ambulance, Burton told him that he did not know what had happened. When pressed, Burton said that he had picked up some friends and that someone other than himself was driving the automobile. But when asked to identify the driver, Burton could not. Then again, he claimed he did

not know what had happened. No evidence emerged to corroborate Burton's statement that there was another driver or occupant in his automobile. Officer Sims, however, noted in his report that Burton did not appear to be under the influence of alcohol.

At the hospital, Burton at first refused a urine sample. After he was informed that a catheter would be used to obtain the sample, he assented and provided the sample. Ultimately, the urinalysis tested positive for the presence of marijuana and cocaine but the tests could not determine the concentration of these substances in Burton's system or when he had ingested the substances.

Boyd and Bartolo meanwhile were not interviewed at the scene as both were airlifted to the hospital. Officer Sims, however, noted that both may have been under the influence of alcohol.[1] Witnesses smelled alcohol around their vehicle and broken beer bottles were observed in and near their vehicle. Bartolo, the driver, died from his injuries later that day. Boyd survived, but has since been confined to health care facilities because of injuries sustained in the crash.

Kentucky State Police accident reconstructionists later determined that Burton's automobile collided with Bartolo and Boyd's vehicle in their lane of travel (slightly to the left of the centerline of the roadway). Burton was subsequently indicted on charges of murder, first-degree assault, and operating a motor vehicle with a suspended license.[2]

At trial, the court instructed the jury on murder, second-degree manslaughter, and reckless homicide for Bartolo's death, and first-degree assault and second-degree assault for Boyd's injuries. The jury found Burton guilty of second-degree manslaughter and second-degree assault, as well as operating a motor vehicle on a suspended license. Burton was sentenced to a total of twenty (20) years imprisonment in accordance with the jury's recommendation of ten (10) years on the second-degree manslaughter conviction and ten (10) years on the second-degree assault conviction, to run consecutively.

## II. ANALYSIS.

### A. The admission of the urinalysis results.

Burton filed a motion in limine requesting exclusion of the urinalysis results as irrelevant and inadmissible because the results failed to establish concentration levels or impairment.

At trial, the lab technician that tested Burton's urine testified that it tested positive for THC (marijuana) and cocaine. She could not, however, say what quantities were present or when the substances had been ingested. Dr. Terry Martinez, a toxicologist and pharmacologist, testified that a urinalysis tests for inactive metabolites (by-products of the drug, not the active drug itself), and therefore the test could only establish that Burton had ingested cocaine and marijuana sometime in the past.

Dr. Martinez explained that the urine test does not indicate whether Burton was under the influence of, or was impaired by, these substances at the time of the test. The effects of cocaine generally last an hour, but a person's urine could test posi-

---

1. Officer Sims was not allowed to testify at trial to the results of Mr. Bartolo's blood alcohol.

2. Burton was also charged with being a first-degree Persistent Felony Offender which was dismissed. His sentence for operating a motor vehicle with a suspended license was ninety (90) days, to run concurrently.

tive from two to four days after its ingestion. The effects of marijuana could last up to six hours, but a person's urine could test positive seven days after its ingestion. Pointedly, Dr. Martinez testified that the urine test indicated absolutely nothing about whether Mr. Burton was impaired at the time of the accident.

According to Dr. Martinez, a blood test is the key indicator for whether or not there is impairment and thus correlates much better to actual impairment. No blood test was performed in this case, nor did the Commonwealth offer any evidence to rebut Dr. Martinez's testimony.

On appeal, Burton contends that for the urinalysis results to be relevant and admissible, the Commonwealth had the burden of proving that the amount of cocaine and marijuana found in his system was sufficient to cause impairment. Burton further argues that even if the urinalysis had some relevance, it should have been excluded as unduly prejudicial under Kentucky Rules of Evidence (KRE) 403, or as evidence of "other crimes, wrongs or acts" under KRE 404.

██ The Commonwealth concedes preservation on the arguments concerning relevancy and KRE 403, but denies preservation as to Burton's KRE 404 issue, asserting that the issue was not raised before the trial court. *See Springer v. Commonwealth,* 998 S.W.2d 439, 446 (Ky. 1999) ("A new theory of error cannot be raised for the first time on appeal.") (*citing* RCr 9.22; *Ruppee v. Commonwealth,* 821 S.W.2d 484, 486 (Ky.1991)).

Here, however, it appears that both matters were brought to the attention of the trial court. *See Lanham v. Commonwealth,* 171 S.W.3d 14, 21 (Ky.2005). The motion in limine, dealing with separate items of evidence, argued both KRE 403 and KRE 404. The hearing on the motion dealt with KRE 403 and KRE 404 concerns, albeit as they related to Burton's prior DUI, which gave rise to the driving on a suspended license charge and was vocalized as the KRE 404 problem, rather than the urinalysis results.[3] In reality, the majority of these issues will be resolved under KRE 403. However, it is clear from the hearing that the court recognized from counsel's discussions, and its review of prior precedents dealing with urinalysis results, that the temporal relationship of the use of the substance measured by the urinalysis would be a factor in the criminality of the event and in the determination of admissibility. However, the determination of admissibility was passed to trial, where Burton's subsequent objection was overruled.

Thus, in deference to the confusion surrounding the appropriate use of urinalysis results (whether it is a KRE 403 or KRE 404 matter), we believe the issue was fairly preserved.

An appellate court ought to be sensitive to the realities, and if it believes there may have been a miscarriage of justice it should use its extraordinary power and reverse a judgment that there may be a fuller development of the facts so that the guilt of the accused, if he is guilty, may be more certainly determined.

---

**3.** At the hearing, the Commonwealth argued that the urinalysis results "were offered as to 'wantonness,'" not to impairment: "It is a factor in the degree of wantonness the jury may find." Appellant's counsel pointed out, however, that "[i]t would have to be going to impairment if you're using it to prove wan-

tonness—'cause otherwise what would be wanton about it," i.e., making the point that prior drug use unconnected with the physical/mental condition and/or circumstances surrounding a criminal event would be inadmissible.

*Stone v. Commonwealth,* 456 S.W.2d 43, 44 (Ky.1970) (*quoting Davis v. Commonwealth,* 290 Ky. 745, 162 S.W.2d 778, 780 (1942)). And plainly, this "merits our reconsideration to remedy the [confusion] in our law." *Lanham,* 171 S.W.3d at 20.

The confusion to which we refer evolves out of the dual nature of urinalysis results. In one instance, it may be part of the crime and thus evidence of, or in support of, the appropriate mental state. On the other hand, it may be so temporally disconnected from the criminal event or criminal mental state at issue as to only constitute proof of other "crimes, wrongs or acts" pursuant to KRE 404. In these latter instances, the evidence must be first evaluated under KRE 404, and if found admissible, then under KRE 403. In the first instance, it is a KRE 402 and KRE 403 matter. Here, it is a KRE 403 matter.

▆▆ Burton was indicted for multiple offenses involving wanton mental states. "One way to prove wantonness is to show that the defendant in a vehicle-homicide [,or injury,] case was driving while intoxicated." *Burchett v. Commonwealth,* 98 S.W.3d 492, 494 (Ky.2003). Here, however, no witness could say what quantities were present or when the substances had been ingested. Dr. Martinez testified that a urinalysis tests for inactive metabolites (break-down products), not the active drug itself, and therefore the test only established that Burton had ingested cocaine and marijuana sometime in the past.

In *Billings v. Commonwealth,* 843 S.W.2d 890, 892 (Ky.1992), this Court noted that:

Against the hoary proposition that we welcome any evidence tending to make a material fact, i.e., an element of the offense, appear more likely or less likely than it would appear absent that evidence, is counterpoised the equally venerable rule that a defendant may not be convicted on the basis of low character or criminal predisposition, *even though* such character or predisposition makes it appear more likely that the defendant is guilty of the charged offense. The upshot is that evidence of criminal conduct other than that being tried is admissible only if probative of an issue independent of character or criminal predisposition, [i.e., KRE 404] and only if its probative value on that issue outweighs the unfair prejudice with respect to character [i.e., KRE 403].

*Id.* (emphasis in original); *See also Rowe v. Commonwealth,* 50 S.W.3d 216, 223 (Ky. Ct.App.2001).

This Court has previously considered issues relating to the admissibility of urinalysis results in *Berryman v. Commonwealth,* 237 S.W.3d 175, 178 (Ky.2007); *see also Parson v. Commonwealth,* 144 S.W.3d 775, 780–81 (Ky.2004); *Estep v. Commonwealth,* 957 S.W.2d 191, 193–194 (Ky.1997); *Bush v. Commonwealth,* 839 S.W.2d 550, 555 (Ky.1992).

In *Bush,* the defendant/driver had an established blood alcohol level of 0.13%. The defendant's urinalysis showed traces of marijuana and amphetamines, yet his blood sample was *negative* for these drugs. "The chemist could not say the drugs were present in [a] sufficient amount to impair, and because [the] drugs where not present in the blood but had passed from the blood into the urine, [the] date and time of ingestion could not be calculated." *Bush,* 839 S.W.2d at 555.

Nevertheless, it was the "Commonwealth's contention that 'the evidence was relevant to show wanton conduct.'" *Id.* The court, recognizing the issue to be "whether [the] evidence showed only a predisposition to act wantonly, or whether it is probative to show the appellant was acting wantonly by driving under the influ-

ence of drugs as well as the alcohol on this occasion," held the admission of the evidence to have been error, but believed, given other evidence of impairment, that the error was "harmless." *Id.* Justice Leibson, who wrote the majority opinion, but also a separate opinion dissenting in part, framed the issue well in his separate opinion, noting:

> The evidence failed the test of relevance because there was nothing to infer that the presence of marijuana and amphetamine as found in the urine made the ultimate fact at issue, whether appellant was driving under the influence, any more or less probable. Certainly we have not yet reached the sorry state of affairs where prior use of marijuana and amphetamines, unrelated to the accident, should be considered evidence to prove wanton conduct on the occasion of the accident.

*Id.* at 557–558 (Leibson, J., dissenting in part and concurring in part). It is noteworthy that the blood analysis in *Bush* established that the drugs did *not* affect the defendant's conduct as they were not in his blood.

*Estep* was next and involved a defendant with no alcohol in her system. Yet, *blood tests* revealed the existence of five (5) different prescription drugs in her body— Xanax, Elavil, Soma, Valium, and Hydrocodone—some at therapeutic levels and some not. In addition, the hospital nurse, assessing the defendant after the accident, found fifty-eight (58) Xanax tablets in her purse and a handful of Soma and Xanax tablets in her pants pocket. In addition to the blood tests, her urinalysis results disclosed the presence of marijuana in her system. Estep, herself, "admitted that she and a friend would sit around the house and smoke marijuana in order to 'try to enjoy a little bit of life.'" *Estep,* 957 S.W.2d at 194. She also discussed her use

of the prescription drugs. Dr. Hunsaker, the Commonwealth's medical expert, testified that the presence of the prescription drugs in the quantities found would cause impairment of one's ability to operate a motor vehicle. He reiterated, "[s]he appeared to be under the influence of something." *Id.* at 195.

Moreover, the prosecution's theory in *Estep* was that Estep "constantly took drugs in order to feel good." *Id.* at 194. This Court, in reviewing the urinalysis results evidencing the presence of marijuana, found that the trial court did not abuse its discretion in admitting the urinalysis results as, in this instance—such evidence was reasonably related to proof of wantonness. *Id.* Moreover, given proof of the impairment, the urinalysis evidence assisted in identifying the substances used by the defendant as well as evidencing temporal aspects of the conduct pertinent to the degree of the wanton conduct, i.e., Estep "constantly took drugs to feel good."

We addressed the issue next in *Parson,* where the defendant had an extremely high blood alcohol concentration of 0.238 grams per deciliter. In addition, his urinalysis results tested positive for "unquantified amounts of cocaine and marijuana." *Parson,* 144 S.W.3d at 780. The Commonwealth's medical expert, Dr. Rodgers, testified in detail to the impairable effects of the blood alcohol level on the defendant, but could not say when the cocaine and marijuana had been ingested and not "know what additional effect would result from a mixture of alcohol and cocaine." *Id.* at 780. Importantly, however, Dr. Rodgers testified that cocaine left no traces in urine after 24 hours.

Thus, when the Court stated, "[w]e believe that evidence that a person charged with vehicular homicide had intoxicating drugs in his system when the homicide occurred is relevant to the issue of wanton-

ness even without additional evidence of *the degree of impairment* caused by *its* presence," *Id.* at 781 (emphasis added), it recognized the temporal link under the evidence at hand (cocaine disappears from urine within 24 hours) of such conduct as a quantifier of the degree of wanton conduct at issue.[4] Notably, extreme impairment during the criminal event (which would have taken time to achieve) had already been established by the blood alcohol analysis. Thus, under the evidence presented to it, the Court held the urinalysis results were relevant to the question and degree of wantonness. *Parson* relied on *Bush* and *Estep*, as well as *State v. McClain*, 525 So.2d 420 (Fla.1988) and *State v. Weitz*, 500 So.2d 657, 659 (Fla.Dist.Ct.App.1986) (disapproved of in part by *McClain*), for support.

In *Weitz*, the defendant/driver was the cause of the accident. The investigating officer arrested him after he failed a series of field sobriety tests because he smelled of alcohol and because of other indications of intoxication. At jail, he was administered two (2) breathalyzer tests which gave successive readings of a 0.017% blood alcohol level. Because *this low reading was inconsistent with the defendant/driver's state of intoxication*, the arresting officer suspected the presence of other drugs and took a urine sample. The urine sample disclosed the presence of an unquantified amount of Methaqualone, Cocaine, and Phenobarbital.

Based upon toxicology testimony that it was impossible to determine the defendant's degree of impairment at the time of the offense (based upon the mere presence of drugs in the defendant's urine), the trial judge suppressed the urinalysis report. However, given the Officer's testimony *of*

*intoxication* and the low level of the breathalyzer results, which *could not explain the intoxication*, the appellate court reversed and held that the urinalysis results did "tend to prove that he was 'under the influence' of those drugs." *Weitz*, 500 So.2d at 659. Here again, once intoxication (or impairment) is established, yet without identification of the substances, the use of urinalysis results is highly relevant to the *identity of the substances causing the intoxication.*

In *McClain*, an analysis of the defendant's blood taken after the accident demonstrated a blood alcohol level of 0.14 and a trace of cocaine. According to the expert chemist who testified at the suppression hearing, the amount of cocaine was so small that the chemist was unable to state whether its presence could have affected the defendant's driving. The trial court then granted the motion to suppress on grounds that the prejudicial impact substantially outweighed its relevance. In upholding the trial court's discretion in suppressing the evidence, the court analyzed the rational of the *Weitz* decision, noting:

> It may be that *McClain* and *Weitz* can be reconciled *when the challenged evidence is viewed in light of its relationship to the other evidence.* In both cases, it could be said that the prejudicial impact of permitting the jury to hear that the defendant had taken illegal drugs was equal but that it was the difference in probative value which tipped the scales. In *Weitz*, the defendant's low blood alcohol test belied the other evidence of his intoxication. Thus, the presence of even a small amount of drugs in the defendant's urine was significant because it provided an explanation for his impaired conduct. In the

---

4. Although Dr. Rodgers testimony in *Parson* as to how long cocaine will show up in an urinalysis (24 hours) differs from that of Dr.

Martinez in this case (2–4 days), a trial court must rely on the evidence in front of it.

instant case, McClain's blood alcohol substantially exceeded the figure necessary to raise a presumption of impairment. Therefore, evidence of a trace amount of cocaine in McClain's blood added little to the state's proof of intoxication. Thus, we cannot say that the decision in *Weitz* was incorrect. However, we disapprove of the opinion ... to the extent indicated above.

*McClain*, 525 So.2d at 423 (emphasis added).[5] Clearly, given the other proof of intoxication, *McClain* was properly resolved under KRE 403.

We have also noted the admissibility of urinalysis results in *Berryman*, 237 S.W.3d at 178 n. 6, though the evidence was addressed within the context of a motion for directed verdict. Therein we noted, that "[a] reasonable reference could be drawn that Berryman was impaired, at least somewhat, by the Xanax in his system." *Id.* at 179. Yet, in *Berryman*, the facts were such as to *compel* a conclusion that the defendant was impaired. *Id.* The defendant was driving at ninety-eight (98) miles per hour when he hit the back of the vehicle ahead of him on an unobstructed four-lane highway. He made no effort to brake or swerve before overtaking and ramming the back of a clearly visible vehicle. *Id.* at 176–178. Pointedly, like *Weitz*, the facts of the accident in *Berryman* left little question as to impairment. The question was one of identifying the substance. Thus, like *Weitz*, the use of the urinalysis was permissible to identify the impairing substance.

 KRE "404(b) ... protects against the introduction of extrinsic act evidence when the evidence is offered solely to prove character [or propensity]. The text contains no intimation, however, that any preliminary showing is necessary before such evidence may be introduced for a proper purpose. If offered for such a proper purpose, the evidence is subject only to general strictures limiting admissibility such as [KRE] 402 and 403." *Commonwealth v. English*, 993 S.W.2d 941, 944–45 (Ky.1999) (quoting *Huddleston v. United States*, 485 U.S. 681, 687–88, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988)). However, "it is a well-known fundamental rule that evidence that a defendant on trial had committed other [crimes] is never admissible unless it comes within certain exceptions, which are well-defined in [KRE 404(b)] itself." *Clark v. Commonwealth*, 223 S.W.3d 90, 96 (Ky.2007) (*quoting Commonwealth v. Buford*, 197 S.W.3d 66, 70 (Ky.2006)). Yet, when offered for a proper purpose—i.e., the taking of illegal drugs during the time frame of, or up to, the criminal event or mental state—"the evidence is subject only to the general strictures limiting admissibility such as [KRE] rules 402 and 403." *English*, 993 S.W.2d at 945. "Indeed, the same item of evidence may be admissible in one case and not in another, depending upon the relation of that item to the other evidence." *McClain*, 525 So.2d at 422 (*citing* E. Cleary, *McCormick on Evidence*, § 185 (3d ed.1984)).

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by

---

**5.** We also discuss the relationship of *Bush, Estep* and *McClain* in a well-reasoned unpublished opinion in *Boggess v. Commonwealth*, No.2001–SC–0263–MR, 2003 WL 1193266 *4–5 (Ky. Jan. 23, 2003).

considerations of undue delay, or needless presentation of cumulative evidence." KRE 403. Obviously, here, there are no considerations of confusion of the issues, misleading the jury, undue delay, or needless presentation of cumulative evidence. Thus, the trial court must determine if the evidence's probative value is substantially outweighed by the danger of undue prejudice.

▬▬ This is a "task properly reserved for the sound discretion of the trial judge," *English,* 993 S.W.2d at 945 (*citing Rake v. Commonwealth,* 450 S.W.2d 527, 528 (Ky. 1970)), and "[t]he standard of review is whether there has been an abuse of that discretion." *Id. (citing Partin v. Commonwealth,* 918 S.W.2d 219, 222 (Ky. 1996)). "The test for abuse of discretion is whether trial judges' decisions were arbitrary, unreasonable, unfair or unsupported by sound legal principals." *Id.*

The Commonwealth argues that consideration of this issue is barred by this Court's decision in *Parson,* holding that such evidence is "relevant to the issue of wantonness even without additional evidence of the degree of impairment caused by its presence." *Parson,* 144 S.W.3d at 781. Yet, as already alluded to, the Commonwealth's argument overlooks the full text of the quote, including use of the word "additional." The full quote was "[l]ike the court in *McClain,* we believe that evidence that a person charged with vehicular homicide had intoxicating drugs in his system when the homicide occurred is relevant to the issue of wantonness even without additional evidence *of the degree of impairment* caused by its presence." *Id.* (emphasis added). The Court referred to *McClain,* which *upheld* the trial court's suppression of the urinalysis evidence because of its holding, "that such evidence is not inadmissible simply because a toxicologist cannot estimate *the degree of impair-*

*ment* caused by its presence." *Id.* at 781 (*citing* to *McClain,* 525 So.2d at 423 (emphasis added)).

In *Parson,* the expert testified:

[T]hat traces of marijuana can remain in the body for weeks after ingestion but that traces of cocaine will disappear within twenty-four hours. He could not say when in the twenty-four hour period Appellant had ingested the cocaine but admitted that he also could not say that Appellant had not ingested the cocaine immediately prior to operating his vehicle. And, although he testified in detail to the effects of a blood alcohol concentration of 0.238 grams per deciliter on the motor skills and judgment of a person with that amount of alcohol in his system, he did not know what additional effect would result from a mixture of alcohol and cocaine.

*Id.* at 780. Thus, in *Parson,* the trial court was confronted not only with an extremely high breathalyzer reading (which reasonably implies a significant time of consumption), but, also with a record that evidentially established that one's use of cocaine will not be revealed on a urinalysis more than *twenty-four hours* after its intake. Thus, remoteness was not a substantial factor in the evaluation.

▬▬ "The requirement that the prior act be 'not too remote' is integral to determining the probative value of the evidence. Thus, an independent act too remote in time will fail the balancing test required by KRE 403." *Robey v. Commonwealth,* 943 S.W.2d 616, 618 (Ky.1997); *see also English,* 993 S.W.2d at 945 ("[T]his is the point at which the issue of temporal remoteness becomes a factor in determining inadmissibility.").

▬▬ Here, neither the lab technicians, nor Dr. Martinez could testify what quantities were present or when the substances

had been ingested. In fact, the evidence here showed that the cocaine could have been taken as much as *four (4) days prior* to the urinalysis test and that the marijuana use may have occurred as much as seven (7) days prior to the urinalysis. Moreover, each witness acknowledged that the urine test indicated absolutely nothing about whether Burton was impaired at the time of the accident. Understandably, given the apparent severity of the head-on-collision, the witnesses' testimony about Burton's conduct while his arm was flopping unnaturally "from side to side," his walking back and forth in a confused state and almost being struck by an arriving ambulance and the testimony concerning his impairment or mental state following the accident was equivocal.[6]

Indeed, Officer Sims wrote in his report that Burton did not appear to be under the influence of alcohol. He noted, however, that the occupants of the other car (Mr. Bartolo and Mr. Boyd) may have been. Several other witnesses smelled alcohol around the Bartolo vehicle and broken beer bottles were observed in and near the vehicle. Moreover, Officer Sims knew, but could not testify to, the results of Mr. Bartolo's blood alcohol level.[7]

More to the point, although the accident reconstructionist's evidence supports the finding of Burton's fault in the accident, neither it, nor any other evidence, *compels* a conclusion that such fault was attributable to an impairment consistent with *Berryman*. Given the scientific evidence of remoteness, as well as the absence of evidence reliably supporting a conclusion of impairment, no significant issue of identity or of a temporal connection to the impairment exists that is consistent with *Weitz*.

Absent a proper context within the other evidence, the introduction of urinalysis results only encouraged speculation. As such, the only real affect the urinalysis results could have had was to brand Burton as a user of drugs. This raises the unduly prejudicial value of the evidence too high to be overcome by the minimal relevancy of its potentially remote use as much as two (2) to seven (7) days prior to the accident. Indeed, Chief Justice Minton, in his dissent, acknowledges that the use of the evidence only makes the issue of use "slightly more probable."

While logic dictates that use of urinalysis results may be accurate to a low or high degree depending upon the conclusions compelled by the supporting evidence, the same logic dictates that its use without such supporting evidence will result in an unreliably higher conviction rate. Thus, once this evidence was introduced to identify Burton as a "known drug user," the jury verdict was a foregone conclusion.

Thus, we must conclude that the trial court abused its discretion in the admission of this evidence and it was error to do so. Within the context of the other evidence we have reviewed and considering the potential result, we cannot say that the error was harmless. Even so, it appears probable that the effect of this evidence may have been multiplied by the testimony of a drug recognition instructor for the Department of Criminal Justice Training Center, an issue which we will consider next.

---

6. One paramedic stated he "suspected" it, but conceded at trial he did not write it down in his report as required. Justice Abramson, in her dissent, writes of this, but such an analysis would effectively swallow KRE 403's balancing mandates in these instances, not to mention considerations dealing with KRE 404.

7. We were not asked to review this ruling and thus do not.

## B. *Drug Recognition Testimony.*

 On August 14, 2006, the day before trial, Burton's counsel received a fax from the Commonwealth stating that it intended to call Mr. Darrell Cook (Cook), a drug recognition instructor for the Department of Criminal Justice Training facility at Richmond, Kentucky. The fax stated that Cook "will testify in regard to drug recognition and the physical signs which point to use of controlled substances. In this case particularly he will speak to blood pressure, dilated eyes, and other relevant factors." Burton filed an immediate written objection to Cook being allowed to testify on grounds that: (1) the Commonwealth's announcement of its intended use of the expert was too late; (2) its expert's opinion was "not supported by a factual basis;" (3) "the opinion was thus irrelevant and inadmissible;" and (4) "the Commonwealth had not provided a curriculum vitae or summary of his report to allow the court or the defense to determine whether [Mr.] Cook is or is not an expert in his field."

On August 15, 2006, the morning of trial, defense counsel again objected to the Commonwealth's last minute calling of Cook, stating that she had not seen his report and had just received the curriculum vitae the previous afternoon. The Commonwealth countered that it had not anticipated using an expert but had only received notice on August 9 that the defense intended to use a toxicologist along with his report. Thus, because the defense had an expert, the Commonwealth felt that it should have one too. While reserving the right to call him during its case in chief, the Commonwealth anticipated using Cook on rebuttal, which would give the defense more time "to look at what he's got." Moreover, the Commonwealth informed the trial court that Cook was the primary drug recognition instruc-

tor at Richmond and that his testimony would be in regard to the information he could extract from the reports of the EMTs and troopers who observed Burton at the scene.

In response, the trial court noted its feelings about expert witnesses, stating "you both got one, you let them both in or neither one of them." The court further stated that it would review the respective motions which had been submitted on the matter and that it could be brought back up when the witness was called. When the Commonwealth called Cook to testify on August 16, the defense reiterated its objections to his testimony, which were overruled.

 Having considered Burton's written objection to Cook's testimony on the basis of his "expertise" and the factual basis for his opinions, the court's inclination "(you both got [an expert], you let them both in or neither one of them")," Burton's argument the morning of trial that "it sounds like he's basing his opinion upon information that's not admissible," and Burton's reiteration of his objection when Cook was called at trial, we believe that Burton's objection to Cook's testimony was adequately preserved. Moreover, even though the written objections, arguments, and ruling were conducted without the benefit of a prior report of the witnesses' testimony, we believe the grounds argued by Burton were apparent from the context of the written objections, responses, and discussions with the court. Thus, "[w]hile the objections were not sharply to the point we think they adequately alerted the trial judge to the proposition." *Hardin v. Commonwealth,* 428 S.W.2d 224, 226 (Ky.1968). That being said, even "[a] general objection is sufficient if the evidence is not competent for any purpose." *Ross v. Commonwealth,* 577 S.W.2d 6, 13 (Ky.App. 1978).

At trial, Cook testified that he was an instructor at the Department of Criminal Justice Training facility at Richmond, Kentucky, where he is the lead instructor of DUI enforcement training. He is also the state coordinator in Drug Recognition, a position which required two weeks of training.

Cook testified that he had reviewed the ambulance report, that Burton's blood pressure of 148/78 was above normal, and that a pulse rate of 113 was high. He opined that the elevation in blood pressure and pulse could be indicative of cocaine, methamphetamine, marijuana, ecstasy, or LSD use. He also opined that the lowering of blood pressure thirty-five minutes later to 138/83 could indicate that the cocaine was wearing off. Referring to the paramedic's testimony, Cook stated that the fact that a person was "wound up", not responding to commands, or resistant to medical treatment, was indicative of marijuana, cocaine, methamphetamine, or other drug use.

However, the twelve-step Drug Recognition Protocol,[8] which he attempted, in part, to employ, requires an officer's *personal* observation, physical testing and examination of the subject.

The protocol essentially consists of a twelve step systematic assessment of the defendant's vital signs and physical appearance, which in fact is the usual DUI investigation, including the standard field sobriety tests, plus a physical examination. The physical examination incorporates a narrow application of techniques borrowed from the medical field, and includes measuring pupil size and observing pupil reaction to light, taking blood pressure and pulse rate [three separate times], inspecting the oral and nasal cavities, and touching the arm to determine muscle tone.

*Williams v. State,* 710 So.2d 24, 28 (Fla. Dist.Ct.App.1998). Thus, "[p]olice officers and lay witnesses have long been permitted to testify as to their observations of a defendant's acts, conduct and appearance, and also to give an opinion on the defendant's state of impairment based upon those observations." *Id.* at 29.[9]

Notably, Mr. Cook was neither a medical doctor nor a pharmacologist. He did not *personally* observe, examine, or test Burton. In fact, he acknowledged that Burton's elevated vital signs and behavior could simply be the result of having just been in a serious car accident and that he could not say definitively whether Burton

---

**8.** The twelve (12) steps of the protocol are: "(1) breath (or blood) alcohol concentration; (2) interview [by] the arresting officer; (3) preliminary examination; (4) eye examinations; (5) divided attention tests; (6) vital signs examination; (7) darkroom examination of pupil size; (8) examination of muscle tone; (9) examination of injection sites; (10) statements, interrogation; (11) opinion; (12) toxicology analysis." *State v. Baity,* 140 Wash.2d 1, 991 P.2d 1151, 1155 (2000).

**9.** This is why every case cited by the Commonwealth in its brief to sustain the testimony of Mr. Cook on the point that testimony from drug recognition experts is regularly admitted involves a testifying officer who personally observed, examined, and tested the

defendant. *See Williams v. State,* 710 So.2d at 33–34 (personal observations, examination and testing); *State v. Klawitter,* 518 N.W.2d 577, 584–85 (Minn.1994) (personal observations, examination and testing); *United States v. Everett,* 972 F.Supp. 1313, 1315 (D.Nev. 1997) (personal observations, examination and testing); *People v. Quinn,* 153 Misc.2d 139, 580 N.Y.S.2d 818, 819, 820 (N.Y.Dist.Ct. 1991) (*rev'd on other grounds,* 158 Misc.2d 1015, 607 N.Y.S.2d 534 (1993)) (personal observations, examination and testing); *State v. Sampson,* 167 Or.App. 489, 6 P.3d 543, 547 (2000) (personal observations, examination and testing); *State v. Baity,* 991 P.2d at 1155 (personal observations, examination and testing).

was under the influence at the time. Such testimony was based solely upon his review of the ambulance report and thus violated the drug recognition protocol alleged to support his appearance. The only apparent basis then for the admission of his testimony was the trial court's philosophy on experts—"you both got one; you let them both in, or neither one of them."

■ We have long recognized the weight the jury puts on an expert's testimony because of the "aura of special reliability and trustworthiness" surrounding it. *Hester v. Commonwealth*, 734 S.W.2d 457, 458 (Ky.1987). And, "[t]here is virtual unanimity among courts and commentators that evidence perceived by jurors to be 'scientific' in nature will have a particularly persuasive effect." John William Strong, *Language and Logic in Expert Testimony: Limiting Expert Testimony by Restrictions of Function, Reliability, and Form*, 71 Or.L.Rev. 349, 367 n.81 (1992). The "danger inherent in the use of scientific evidence is that the jury may accord it undue significance because it associates 'science' with truth." *State ex rel. Hamilton v. City Court of City of Mesa*, 165 Ariz. 514, 799 P.2d 855, 859 (1990). Therefore, "[t]he function of the court is to ensure that the persuasive appeal is legitimate." *State v. O'Key*, 321 Or. 285, 899 P.2d 663, 672 (1995). Trial courts should not overlook the "overall effect that a technique's aura of scientific certainty will have *on the jury*" *Sampson*, 6 P.3d at 551 (emphasis in original).

■ The standard of review of a trial court's ruling on the admissibility of expert testimony is whether the trial court abused its discretion. *Farmland Mut. Ins. Co. v. Johnson*, 36 S.W.3d 368, 378 (Ky.2000); *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 577–78 (Ky. 2000). The test for abuse of discretion is whether the trial court's decision was arbi-

trary, unreasonable, unfair or unsupported by sound legal principles. *Id.* at 581. In the present case, the trial court's ruling appears to have been based solely on the fact that because the defense had an expert, the Commonwealth could have one too. We cannot say that this reasoning is supported by sound legal principles.

■ Further, Cook's unqualified testimony improperly invited the jury to speculate that Burton could have been under the influence of LSD, ecstasy, and methamphetamine—all illicit substances of which there was no evidence. Although we acknowledge that drug recognition testimony is admissible based upon personal observation, examination, and testing, *see e.g., Williams*, 710 So.2d at 34, we therefore caution the trial court to test this witness and his conclusions per KRE 702 at any retrial.

### C. *The testimony of James Boyd.*

■ James Boyd suffered massive injuries in the collision, which left him severely disabled and speech-impaired. Burton filed a motion in limine to exclude Boyd's testimony on grounds that "[i]t is defense counsel's understanding that Mr. Boyd neither remembers the accident nor has any first-hand knowledge as to how it happened. Therefore testimony regarding his injuries would be irrelevant pursuant to KRE 402." In its response, the Commonwealth argued that Boyd does have some memory of the incident but whether Boyd has any memory of the crash is, in any court, a question for the jury. The Commonwealth further argued that the fact and extent of Boyd's injuries was relevant to proving "serious physical injury" for purposes of first-degree assault.

At the hearing on the motion, the Commonwealth acknowledged that six months before trial Boyd could not have been able

to communicate, but that Boyd had since improved and recently indicated that he did remember the accident and could communicate, although he would be difficult to understand. The court then ruled that as long as Boyd could communicate, he could testify. The defense could then test his ability to recollect. Finally, the court ruled that Boyd's injuries were relevant to proving serious physical injury.

At trial, Boyd's speech was very difficult to understand. But when asked if he remembered the wreck, he appears have said, "yeah." When asked whether he was on his side of the road or on Burton's when the wreck occurred, Boyd appears to say "ours."

Because Boyd was difficult to understand, the trial court suggested that he demonstrate with his hands which side of the road he meant. The prosecutor then asked Boyd to imagine his (the prosecutor's) arms were two different sides of the road. The prosecutor then raised his right arm and explained this represented Boyd's side of the road. The prosecutor raised his left arm and explained this represented the other side of the road. The prosecutor then asked Boyd which side of the road he was on when the cars collided. The prosecutor then leaned toward Boyd with his right arm closest to Boyd. Boyd reached out and touched the prosecutor's right arm, ostensibly testifying that he and Bartolo were in their lane of travel when the collision occurred.

KRE 601 provides, in part:

(b) Minimal qualifications. A person is disqualified to testify as a witness if the trial court determines that he:

(1) Lacked the capacity to perceive accurately the matters about which he proposes to testify;

(2) Lacks the capacity to recollect facts;

(3) Lacks the capacity to express himself so as to be understood, either directly or through an interpreter; or

(4) Lacks the capacity to understand the obligation of a witness to tell the truth.

■■■ KRE 601 establishes a presumption of competency and allows disqualification of a witness "only upon proof of incompetency." *Price v. Commonwealth*, 31 S.W.3d 885, 891 (Ky.2000). First, the defense presented no evidence to indicate that Boyd, as the passenger in Bartolo's car, was incapable of perceiving the collision at the time it occurred. KRE 601(b)(1). Second, when asked if he remembered the accident, Boyd apparently said, "yeah." KRE 601(b)(2). The burden was on the defense to prove that he could not recollect. The defense, however, chose not to cross-examine Boyd nor present any evidence to rebut his assertions.

■■■ On the witness stand, Boyd was awake and attentive and he appeared to be listening to and understanding the questions being directed to him. Although his speech was very difficult to understand, his responses of "yeah" and "ours" were discernable. Further, in light of Boyd's speech disability, we see nothing amiss in the trial court's allowing Burton to gesture as an alternate means of communication. Although Burton attempts to argue that Boyd only pointed to the prosecutor's right arm because it was the closest to Boyd, (representing that he and Boyd were in their lane when the crash occurred), the defense was free to cross-examine Boyd on this issue and chose not to. Under these facts, we cannot say the trial court's finding of competency was an abuse of discretion. *Whitehead v. Stith*, 268 Ky. 703, 105 S.W.2d 834, 837 (1937) (stating that a trial court's competency determination is reviewed under an abuse of discretion standard). As to the intimation that Boyd's

pointing was influenced by the closeness of the prosecutor's right arm, this should certainly be avoided at retrial.

 Burton additionally argues that Boyd's testimony violated KRE 403, on grounds that Boyd was incompetent to testify and that his severe disabilities aroused undue sympathy for him from the jury. We disagree. We have addressed the competency issue above. As to the probative value of the testimony, other than Burton—who did not testify and had stated that he did not know what happened—Boyd was the only surviving eyewitness to the crash. Thus, his testimony was highly probative of how the crash occurred. In addition, Boyd's injuries were relevant to proving the "serious physical injury" element of the first-degree assault charge. Kentucky Revised Statutes (KRS) 508.010.

██ As to Burton's claim of undue prejudice resulting from Boyd's sympathetic appearance and his contention that the prosecution could have introduced medical evidence to establish Boyd's injuries, "the prosecution is permitted to prove its case by competent evidence of its own choosing, and the defendant may not stipulate away the parts of the case that he does not want the jury to see" *Barnett v. Commonwealth,* 979 S.W.2d 98, 103 (Ky. 1998). So, we find no error in the trial court's admission of Boyd's testimony.

### D. *The Mistrial Motion.*

██ Burton contends that the trial court erroneously denied his mistrial motion after a prosecution witness revealed that Burton had a prior DUI, contrary to the parties' agreement that his prior DUI would not be mentioned at trial. We note, however, that the prosecutor did not appear to intentionally elicit the existence of the prior DUI. Instead, after being asked by the prosecutor how he found out the identities of people on the scene, the police officer volunteered that he found out Burton's license was suspended for DUI. Immediately, the trial court admonished the jury to disregard the answer as "non-responsive" and directed the prosecutor to "get something accurate" through other questions.

██ A jury is presumed to follow the trial court's admonition. *Martin v. Commonwealth,* 170 S.W.3d 374, 381 (Ky.2005). Given this admonition, we find no reason to question the trial court's decision to deny the mistrial. Moreover, we do not believe this will reoccur at trial.

### E. *Sufficiency of the Evidence.*

 Lastly, Burton argues that the trial court erred in denying his motion for a directed verdict based on insufficiency of evidence as to wantonness. We consider this issue only for reasons of its potential to result in a dismissal, rather than a retrial, as is necessitated by previously discussed errors.

The Commonwealth contends that this issue is not preserved for our review because the basis of the directed verdict motion at trial was insufficient evidence of Burton's being "under the influence" and being at fault for the collision. While the exact words used may not be identical, a contention of insufficiency of evidence of both impairment and being at fault for the collision sounds substantially like a contention of insufficient evidence of wantonness, which would not be shown in the absence of evidence of being at fault for the collision. Thus, we conclude that the issue is preserved for review on the merits.

 As we have frequently stated: On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of

the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991) ("On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal."). *Id.*

Burton contends that reliable evidence of wantonness is lacking. He relies on his assertions that (1) the urinalysis evidence was inadmissible, (2) that Boyd was not competent to testify, and (3) that the "drug recognition expert" testimony should have been excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

▮▮▮ Burton's argument, however, is merit less as the evidence an appellate court must consider in determining whether or not the evidence was sufficient to support a given point is the *same* evidence considered by the trial court, rightfully or wrongfully. *Lockhart v. Nelson,* 488 U.S. 33, 41–42, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988) ("[A] trial court in passing on such a motion considers all the evidence it admitted, and to make the analogy complete it must be the same quantum of evidence which is considered by the reviewing court."); *United States v. Quinn,* 901 F.2d 522, 523 (6th Cir.1990) ("We have considered the challenged testimony in reviewing the sufficiency of the evidence."); *T.B. Jones & Co. v. Pelly,* 128 S.W. 305, 307 (Ky.

1910) ("While the competency of this statement is questioned, it must be considered on the appeal for the reason that it was admitted by the Circuit Court over Appellant's objection, and if it had been excluded other evidence might have been adduced."); *see also Commonwealth v. McManus,* 107 S.W.3d 175, 178 (Ky. 2003) ("[T]he Court of Appeals exceeded the scope of its authority when it essentially directed an acquittal ... by 'ruling on evidence of admissibility as opposed to evidence sufficiency.' "). Any contrary definition of the evidence reviewable by appellate courts for insufficiency would only result in a further review of the appellate court's actions rather than the trial court's.

Moreover, we must review the evidence introduced in its best light in favor of the Commonwealth. As the Commonwealth points out, there was evidence that Burton's automobile crossed the center line of the road when the collision occurred. And there was evidence before the trial court that would, in its best light, support a reasonable inference of impairment, i.e., Mr. Cook's evidence.

Applying all reasonable inferences from the evidence that was then before the trial court in favor of the Commonwealth, we cannot say that the trial court should have directed a verdict in Burton's favor, nor that it would be clearly unreasonable for a jury to have found guilt on the "wanton" crimes for which Burton was ultimately convicted—second-degree manslaughter and second-degree assault. Thus, we do not find that the evidence was insufficient.

### III. *CONCLUSION.*

For the foregoing reasons, we reverse Burton's convictions for second-degree manslaughter and second-degree assault and remand the same for further proceedings consistent with this opinion. We af-

firm, however, Burton's conviction for operating a motor vehicle with a suspended license.

NOBLE and VENTERS, JJ., concur.

SCHRODER, J., concurs in result only.

MINTON, C.J.; concurs in part and dissents in part by separate opinion with ABRAMSON, J., and CUNNINGHAM, J., joining that opinion.

ABRAMSON, J., concurs in part and dissents in part by separate opinion with MINTON, C.J., and CUNNINGHAM, J., joining that opinion.

MINTON, Chief Justice, Concurring, in Part, and Dissenting, in Part:

Because it is a startling departure from precedent, I respectfully dissent from the majority's conclusion that the urinalysis showing Burton had used marijuana and cocaine is inadmissible. I also respectfully dissent from the majority's conclusion that the issue regarding Darrell Cook's testimony was adequately preserved for appellate review.

1. *The Trial Court Did Not Abuse*
 *its Discretion by Admitting*
 *the Urinalysis.*

I readily acknowledge that the urinalysis did not determine the concentration of marijuana or cocaine in Burton's system, nor did it indicate when Burton had used those illegal drugs. But the indisputable fact that Burton had used marijuana and cocaine at some point in the recent past was a relevant and probative factor from which the jury could reasonably have in-

ferred that Burton was impaired at the time of the tragic accident.

All relevant evidence is presumptively admissible under Kentucky Rules of Evidence (KRE) 402.[10] Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. Because the presence of cocaine and marijuana in Burton's urine could lead a fact-finder to a reasonable inference that it was more probable that Burton acted wantonly in causing the accident, the urinalysis results should be deemed admissible, unless excluded for another reason. Although it also mentions KRE 404(b), the majority apparently concludes that the urinalysis was inadmissible under KRE 403 because, in the majority's view, the probative value of the urinalysis was substantially outweighed by the danger of undue prejudice. I strongly disagree.

Similar to the present case is *Parson v. Commonwealth,* 144 S.W.3d 775 (Ky.2004), in which the appellant had a urinalysis performed at a hospital one hour after a motor vehicle accident. And, like the present case, the urinalysis showed traces of cocaine and marijuana although it could not be determined when the drugs were ingested or the degree of impairment they caused. *Id.* at 780. We held in *Parson* that the urinalysis results were admissible because "evidence that a person charged with vehicular homicide had intoxicating drugs in his system when the homicide occurred is relevant to the issue of wantonness even without additional evidence of

---

**10.** KRE 402 provides: "All relevant evidence is admissible, except as otherwise provided by the Constitutions of the United States and the Commonwealth of Kentucky, by Acts of the General Assembly of the Commonwealth of Kentucky, by these rules, or by other rules adopted by the Supreme Court of Kentucky. Evidence which is not relevant is not admissible."

the degree of impairment caused by its presence." *Id.* at 781.

I agree with the majority's proposition that a large and readily identifiable quantity of alcohol was present in the defendant's bloodstream in *Parson.* But I disagree with the majority's interpretation of *Parson.* The presence of alcohol in *Parson* was irrelevant to the conclusion that the urinalysis was admissible. We held that the jury was informed "in detail to the effects of a blood alcohol concentration of 0.238 grams per deciliter on the motor skills and judgment of a person with that amount of alcohol in his system . . . ." *Id.* at 780. Yet, we still held that the urinalysis was admissible because "evidence that a person charged with vehicular homicide had intoxicating drugs in his system when the homicide occurred is relevant to the issue of wantonness *even without additional evidence of the degree of impairment caused by its presence." Id.* at 781 (emphasis added). Nowhere in our opinion in *Parson* did we base the admissibility of the urinalysis upon the presence of alcohol. In fact, we held that the urinalysis was admissible even though (1) the urinalysis did not inform the jury of the degree of impairment and (2) the jury had already been informed of the effect alcohol had on the defendant. So, far from being interrelated, the admissibility of the urinalysis was an entirely separate matter from the alcohol-related evidence. How is it possible to conclude from virtually identical facts that the urinalysis was admissible against Parson but is inadmissible against Burton?

The majority's conclusion also distorts and conflicts with our holding in the recent case of *Berryman v. Commonwealth,* 237 S.W.3d 175 (Ky.2007). In *Berryman,* a

defendant argued that he should have been granted a directed verdict on wanton murder and assault stemming from a tragic auto accident. *Id.* at 177. We disagreed with the defendant, at least in part, because a chemist testified that the defendant had traces of Xanax in his system— even though the chemist was not able to state conclusively whether the Xanax had impaired the defendant. *Id.* at 178 n. 6. Despite no evidence directly linking the Xanax with impairment, we nevertheless held that "the finder of fact would be permitted to draw a reasonable inference that the Xanax did, in fact, impair Berryman's ability to operate a motor vehicle in a safe, lawful manner." *Id.* We even reiterated later that "[a] reasonable inference could be drawn that Berryman was impaired, at least somewhat, by the Xanax in his system." *Id.* at 179. How was it permissible for a jury reasonably to infer that Berryman was at least somewhat impaired by the Xanax in his system, but it is unreasonable for a jury to be trusted to decide reasonably whether Burton was at least somewhat impaired by the marijuana and cocaine found in his system?

Contrary to the majority's astonishing conclusion, we did not say in *Berryman* that other factors (such as the defendant's driving at a high rate of speed) "were such as to *compel* a conclusion that the defendant was impaired." Majority opinion, p. 136. Instead, as quoted above, we simply held that the presence of Xanax, along with other factors, was only sufficient to support a reasonable inference of impairment. Indeed, the crash arguably may have been a result of inattentive driving because there was also evidence that Berryman was watching his passenger count pills and, thus, was driving in an inattentive manner before the crash.[11] *Id.* at

11. "[T]wo witnesses observed that Berryman appeared to be preoccupied with something in the center or passenger area of the car shortly before the accident." *Id.* at 176–77.

176–77. The majority mischaracterizes the evidence when it opines that the facts in *Berryman* compelled a conclusion that Berryman was impaired.

I also disagree with the majority's unduly narrow interpretation of *Estep v. Commonwealth*, 957 S.W.2d 191 (Ky.1997), involving yet another wanton murder charge stemming from a tragic automobile accident. In *Estep*, the jury heard detailed testimony about the name and effects of five different prescription drugs found in the defendant's blood, as well as whether those drugs were found to be within proper therapeutic levels. *Id.* at 192–93. Nevertheless, we held that the Commonwealth was entitled to introduce evidence regarding a urinalysis that showed the presence of marijuana in the defendant's urine because we believed that urinalysis was probative of the issue of wantonness. *Id.* at 193–94.

Contrary to the majority's assertion, nowhere in *Estep* did we hold that "the urinalysis evidence assisted in identifying the substances used by the defendant...." Majority opinion, p. 134. To the contrary, the other five prescription drugs found in the defendant were already known by a blood test. *Id.* at 193 ("Blood tests revealed the existence of five different types of drugs in Estep's body...."). And I am puzzled by the point the majority tries to make when it opines that we deemed admissible the urinalysis in *Estep* in order to "evidenc[e] temporal aspects of the conduct pertinent to the degree of the wanton conduct...." Majority opinion, p. 134. As I read it, all *Estep* stands for is the simple proposition that a urinalysis showing that drugs were present in a defendant's system contemporaneously with the alleged commission of the underlying offense(s) is admissible, even if the urinalysis does not definitively show the amount of drugs or the drugs' precise effects upon a defendant.

Finally, as I construe it, *Bush v. Commonwealth*, 839 S.W.2d 550 (Ky.1992), is distinguishable and does not affect the admissibility of Burton's urinalysis. In that case, a blood test performed upon a person charged with wanton murder revealed an alcohol concentration of 0.13 percent. The blood test was negative for other drugs, but a urinalysis revealed the presence of marijuana and amphetamines. *Id.* at 555. Because the marijuana and amphetamines were not found in the defendant's blood, a chemist was unable to testify that the marijuana and amphetamines caused impairment. We held that "if it was error to admit this testimony [regarding the urinalysis], it was harmless." *Id.* So *Bush* is unlike the present case because a blood test was taken in that case that was negative for the presence of marijuana and amphetamines, meaning that it would have been illogical to infer impairment from the presence of those drugs in the defendant's urine. In other words, impairment should not be inferred from a urinalysis if the drugs found in the urinalysis were not also found in a contemporaneous blood test. Obviously, the situation in *Bush* is far different from the present case because no contemporaneous blood test was performed on Burton.

Despite its attempt to argue to the contrary, the majority's novel conclusion is directly and unmistakably contrary to our previously consistent precedent. Because

---

Indeed, the majority's remarkable conclusion that the evidence compelled a finding that Berryman was impaired is belied by the fact that one of the main thrusts of Justice Schroder's dissent in that case was his belief that a driver's inattentiveness while speeding was not sufficient to rise to the level of wanton conduct necessary to support a conviction for wanton murder. *Id.* at 180–82.

I believe it is impossible to distinguish legitimately this case from the consistent troika of *Parson, Berryman,* and *Estep,* Kentucky's bench and bar will have an impossible task in future cases in determining whether similar urinalysis results will be admissible. Indistinguishable cases should not yield different results.

The fact that Burton had illegal drugs or their metabolites in his urine obviously would make recent drug use before driving at least slightly more probable than a negative urine drug screen or lack of any urine drug screen. And recent drug use before driving would impact whether Burton had acted wantonly. So it is clear to me that the trial court did not abuse its discretion in admitting the urinalysis into evidence.

I recognize that the presence of drug metabolites in Burton's urine might not be, by itself, sufficient to establish wantonness. But in determining whether evidence is admissible, a court must focus on the relevancy of the evidence, not its sufficiency. ROBERT G. LAWSON, KENTUCKY EVIDENCE LAW HANDBOOK § 2.05(3) (4th ed.2003). So the Commonwealth was not required to prove that the drugs were present in sufficient quantity to cause impairment, nor to show any additional proof that Burton was actually impaired in order for the urinalysis evidence to be relevant.

*Parson,* 144 S.W.3d at 781. Or, in other words, I believe the majority errs when it opines that evidence of this nature is admissible only if it *"compels* a conclusion" that the accident leading to the charges was attributable to impairment. Majority opinion, p. 138. The standard for admission of evidence is whether it makes a relevant issue more or less probable, not whether it compels a conclusion. So, in addition to being directly contrary to our precedent on this exact point, the majority's opinion blurs what has been a clear line of demarcation between the standard for determining the admissibility of evidence and the standard for determining the sufficiency of evidence.[12]

Simply put, the admissibility of evidence does not, and should not, depend upon whether the evidence compels a certain conclusion. Rather, evidence is admissible only if it merely makes more probable or less probable "the existence of any fact that is of consequence to the determination of the action. . . ." KRE 401. The fact that Burton had illegal drugs in his system contemporaneously with the accident should have been made known to the jury, and the jury could have made as much or as little of that evidence as it deemed proper. In other words, since the urinalysis was admissible, it should have been left to the jury, not this Court, to decide

---

**12.** *See* LAWSON, KENTUCKY EVIDENCE LAW HANDBOOK § 2.05(3) at p. 80:

"In other words, to meet the test of relevancy, evidence need not be even moderately probative of a material fact; [r]elevance is established by any showing of probativeness, however slight.

Lack of appreciation of the leniency of this requirement and of the law's powerful tilt toward admission over exclusion can result from inadequate awareness of the difference between the concepts of relevancy and sufficiency. It needs always to be remembered that relevancy determinations resolve mere admissibility issues while sufficiency decisions determine if disputes are to end or continue. It needs to be remembered that relevancy determinations focus on individual items of evidence while sufficiency determinations focus on the totality of evidence. It is because the two concepts perform different functions and focus on evidence in different ways that each has its own standard of measurement. Evidence is relevant if it has any probative force; evidence is sufficient only if its probativeness is strong enough to induce belief in the minds of reasonable people. The difference is great rather than slight." (Footnotes and internal quotation marks omitted.)

whether Burton's drug usage was "disconnected from the criminal event or criminal mental state at issue...." Majority opinion, p. 133. I disagree with the majority's insistence on hiding this potentially highly relevant fact from the jury under the cover of KRE 403.

The trial court has discretion to determine whether the probative value of the evidence is outweighed by any undue prejudice. *Parson*, 144 S.W.3d at 781. Unlike the majority, I conclude that the trial court did not abuse its discretion here, especially since the Commonwealth's testimony regarding the urinalysis evidence was subjected to vigorous cross-examination and Burton presented his own expert who testified concerning what the urinalysis could (and could not) show. The majority sidesteps or minimizes much of the evidence as it substitutes its analysis of the evidence for that of the trial court. Taken in the proper evidentiary context in the present case, the urinalysis results are highly probative. More specifically, the probative value of the presence of the drugs in Burton's urine is heightened by: (1) the paramedic's testimony that he suspected Burton was impaired, (2) Burton's asking Parnell not to call the police or an ambulance to the crash scene, (3) Burton's initial refusal to give a urine sample until he was threatened with catheterization, and (4) Burton's very erratic behavior at the crime scene.

In short, I would follow our established precedent, recognize the trial court's inherent discretion regarding the admission of evidence, and affirm.

2. *Issue of Whether Expert Testimony of Drug Recognition Instructor was Properly Admitted Waived by Failure to Request a Hearing on this Issue.*

Burton argues that the testimony of Darrell Cook, a drug recognition instructor, does not satisfy the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). But because Burton failed to request a *Daubert* hearing in the trial court or demand a ruling from the trial court on Cook's qualifications to present expert testimony, I disagree with the majority's conclusion that the issue is properly preserved for our review. However, if the majority believes the issue was adequately preserved, I believe it should have provided guidance to the trial court about the admissibility of the evidence on remand instead of merely "caution[ing] the trial court to test this witness and his conclusions per KRE 702 ...." (Majority opinion, p. 141). After all, since the case is being remanded on other grounds and since it is highly likely the Commonwealth will again seek to admit Cook's damning testimony, why would the majority strain to find an issue preserved only to decline ultimately to resolve the issue?

Without belaboring the facts, suffice it to say that I agree with the majority that the trial court's belief that the Commonwealth was entitled to an expert witness simply because the defense had one was improper. The facile old maxim, "what's good for the goose is good for the gander," is not a proper basis for determining the admissibility of expert testimony. But I would refrain from deciding whether the trial court's ultimate decision was correct because I agree with the Commonwealth that this issue was not properly preserved. The majority also fails to decide explicitly whether the trial court's decision to admit the testimony was proper. It is unclear to me why the majority believes it proper to castigate Cook's testimony as being "unqualified testimony" that "improperly invited the jury to speculate that Burton could have been under the influence of ... illicit substances of which there was no

evidence" [13] while refusing to take the next logical step of holding that the admission of that so-called unqualified testimony was improper.

At best, Burton's concerns about Cook's qualification had been arguably raised to the trial court through Burton's earlier written objection, stating that "the Commonwealth has not provided a *curriculum vitae* for Mr. Cook to allow the Court or the defense to determine whether Cook is or is not an expert in his field." But Burton failed to request a *Daubert* hearing or otherwise demand a ruling from the trial court on Cook's qualifications to testify as an expert witness, thereby waiving the issue. *See Dillard v. Commonwealth,* 995 S.W.2d 366, 371 (Ky.1999) ("It is the duty of one who moves the trial court for relief to insist upon a ruling, and a failure to do so is regarded as a waiver.").

Frankly, whether Cook was properly qualified to offer expert testimony about Burton's possible drug use based upon others' observations of Burton's behavior and vital signs poses a troubling question. But since an insufficient record has been developed on this question before the trial court, we should refuse to speculate on what an unrequested *Daubert* hearing might have indicated. *Tharp v. Commonwealth,* 40 S.W.3d 356, 368 (Ky.2000) ("We decline to speculate on the outcome of an unrequested *Daubert* hearing, or to hold that the failure to conduct such a hearing *sua sponte* constitutes palpable error"); *Mondie v. Commonwealth,* 158 S.W.3d 203, 212 (Ky.2005) (issue of qualification as expert unpreserved where objection was to testimony as lay witness, and no *Daubert* hearing was requested).[14] What we should not do, however, is stretch our preservation rules past what had been recognized

as the breaking point only to refuse to determine explicitly whether the contested evidence should have been excluded. Because the present case is being remanded on other grounds, why did the majority choose to address this issue at all if it did not want to resolve it on its merits?

I firmly believe the issue was inadequately preserved for our review and, thus, would summarily affirm because this issue does not lend itself to palpable error review. *Tharp,* 40 S.W.3d at 368. But, since the majority finds the question to be preserved, I am perplexed as to why it did not choose to resolve this important issue.

### 3. Conclusion.

I concur with the majority as to the issues regarding the testimony of James Boyd, the mistrial, and the sufficiency of the evidence. I respectfully dissent, however, from the majority's analysis and conclusions regarding the urinalysis. I also respectfully dissent from the majority's determination that the issue of the admissibility of Cook's testimony was properly preserved. I would affirm Burton's convictions and sentence.

ABRAMSON, J., and CUNNINGHAM, J., join this opinion.

ABRAMSON, Justice, Concurring in Part and Dissenting in Part:

I join completely in Chief Justice Minton's dissent, sharing particularly his concern about the majority's "startling departure" from precedent on the urinalysis issue and the resulting confusion for bench and bar. I write separately on this very important issue because I am compelled to underscore that the majority, as the Chief Justice notes, also depart from

13. Majority opinion, p. 141.

14. The majority does not cite or discuss *Dau-*

*bert.*

the record in this case. Indeed, they depart radically from the record. Most especially, what about Mark Travis?

Mark Travis is the paramedic who treated Burton at the scene. The Commonwealth's brief describes his testimony (accurately in my view, having watched the videotape) as follows:

> Travis treated Appellant at the scene. Travis noticed that Appellant appeared to be trapped in the vehicle, but had no life-threatening injuries. Travis told Appellant to remain calm and to not move. Appellant, however, continued to jerk and pull, trying to get himself out of the vehicle. Travis stated Appellant refused to follow his directions.

> Despite being implored to remain still, Appellant eventually extricated himself from the vehicle. Outside the vehicle, Travis assessed Appellant and noticed Appellant had a compound fracture of his arm. Even though his arm was broken and flopped from side to side, Appellant continually informed Travis that he was okay.

> Travis walked Appellant across the road to the ambulance for further care. While Travis continued to try and provide medical attention to Appellant, Appellant would walk away, cross the road, return to his car, and then walk back to the ambulance. When a second ambulance arrived, Travis had to pull Appellant from its path to keep him from being hit.

> Travis finally got Appellant into the ambulance. At one point, Appellant stated he had hit a tree; later Appellant stated he did not know what happened. Appellant then stated someone else was in the car with him. Appellant's car was searched, but no one else was found.

> Inside the ambulance, Travis took Appellant's vital signs. Appellant's blood pressure was 148/78, his pulse was regular at 113 beats per minute, his respirations were twenty-six per minute, and his oxygen blood content was ninety-five percent. Approximately thirty minutes later, Appellant's blood pressure was 138/83, his pulse was 103 beats per minute, his respirations were twenty-two per minute, and his oxygen blood content was one hundred percent.

> Travis suspected Appellant was under the influence. Appellant did not respond like a person who was in shock normally responded. Travis explained that a person who was in shock would normally calm down and cooperate after he talked to that person. Appellant, however, did not calm down and did not cooperate with emergency personnel.

> . . . .

> Travis transported Appellant to Parkway Regional Hospital. There, Appellant continued to be uncooperative and combative with hospital personnel. Appellant initially refused to provide the emergency room nurse with a urine sample, but later agreed when Travis and the nurse informed Appellant they would put a catheter in him.

Commonwealth's Brief at pp. 2–4 (footnote and 25 citations to the record omitted).

This is the testimony of the paramedic charged with Burton's care immediately following the collision until such time as emergency room personnel assumed those duties. The majority acknowledge Travis's struggles with the combative Burton at the scene but reduce Travis's testimony about his observations and belief in Burton's impaired state to a footnote: "One paramedic stated he 'suspected' it [impairment], but conceded at trial he did not

write it down in the report as required." Since when did an error in paperwork, assuming it was error,[15] preclude relevant testimony?

What about Mark Travis? His sworn testimony has been ignored, or at the very least minimized, because it does not fit into the majority's thesis that the Commonwealth was "without supporting evidence" for its position that Burton was impaired by drugs. If Burton's behavior and Travis's trained observations (in addition to the other evidence referenced by Chief Justice Minton) do not satisfy the majority, I am left with the impression that their new approach will require one of three things, *i.e.* a confession of immediately prior drug use by the defendant, testimony from a credible (indeed, credible in this Court's view) witness who saw such immediately prior usage, or blood tests that substantiate the urinalysis. The first two are unlikely in most cases so immediate blood tests must become the norm in order to prosecute impaired drivers who choose drugs as opposed to alcohol.

MINTON, C.J.; and CUNNINGHAM, J., join this opinion.

---

**15.** Travis acknowledged that he did not record his observations regarding impairment, noting the forms were "new" and no one was really familiar with them at the time. He did not describe this information "as required" nor are we cited to any other evidence which would suggest it was error to omit the observation.